## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

IN THE MATTER OF THE SEARCH OF
73 WATER STREET, APARTMENT #102,
SACO, MAINE

No. 2:24-mj-230-KFW

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, David C. Fife, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with Homeland Security Investigations ("HSI") and have been since August 2009. I am currently assigned to HSI's Portland, Maine office. I have participated in numerous criminal investigations, to include matters involving the general smuggling of contraband into the United States, as well as specific investigations involving the trafficking of narcotics across the United States border. Through my training and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in drug trafficking. In my career I have utilized various investigative tools and techniques to include the use of search warrants.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search the residence located at 73 Water Street, Apartment #102, Saco, Maine (the "SUBJECT LOCATION") being utilized by Target Subject ERIC PETERSEN for the manufacture and distribution of controlled substances, including Dimethyltryptamine ("DMT"), as detailed below. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers, other agents, and

witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant.

3.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) (Distribution or Possession with Intent to Distribute Controlled Substances), 846 (Attempt and Conspiracy), 856 (Maintaining a Drug-Involved Premises), 952(a) (Importation of a Controlled Substance), and 963 (Conspiracy to Import Controlled Substances) have been committed, are being committed, and will be committed by PETERSEN, and others unknown.

4.     There is probable cause to search the SUBJECT LOCATION as described and depicted herein and in Attachment A for evidence and instrumentalities of these crimes as described in Attachment B.

## PLACE TO BE SEARCHED

5.     As described and depicted herein and in Attachment A, this application is for a warrant to search the residence located at 73 Water Street, Apartment #102, Saco, Maine, more particularly described as a four-unit, three-story multi-family residential structure. The building has light color vinyl siding with green shutters and a shingle roof. The building is clearly marked with the number "73," posted on the Water Street side of the building. There is a white exterior door off the parking lot, which leads into a common hallway. Apartments "101" and "102" are located on the first floor, with a stairwell leading upstairs to the additional two apartments. Apartment "102" is clearly marked and is the furthest door beyond the stairwell upon entry. A photograph of the property appears below:



**PROBABLE CAUSE**

**A. International Deliveries of DMT Precursors to the SUBJECT LOCATION**

6.      Parcels arriving in the United States often go through customs before being delivered to their destinations.  To facilitate this process, United States Customs and Border Protection ("CBP") Officers work in New York City to monitor international mail and cargo facilities located at the John F. Kennedy International Airport ("JFK") International Mail Facility ("IMF"). CBP Officers conduct routine examinations of international parcels as they enter the United States before clearing them for delivery.

7.      Pursuant to their authorities as customs officers under Title 19 of the United States Code, CBP Officers may conduct examinations of goods entering the United States without a search warrant, probable cause, or individualized suspicion.  HSI Special Agents

are granted this same authority, commonly known as "Border Search Authority." *See* 19 C.F.R. § 162.6.

8.      On about December 12, 2023, a CBP Officer in Maine targeted a foreign shipment inbound to Maine with a manifested description of "Botanica." The shipper was listed as "Alejandro Gomez Fuentes" in Mexico, with the consignee listed as Target Subject ERIC PETERSEN at the SUBJECT LOCATION. This shipment was suspected of containing Dimethyltryptamine ("DMT"), a hallucinogen and a DEA Schedule I controlled substance, due to the shipper's prior history involving seizures of wood chips containing DMT bearing similar cargo descriptions of "Botanica Acacia." A search of the Maine driver's license database revealed that the SUBJECT LOCATION was the listed address for PETERSEN, born in March 1971. Research in consumer databases of the listed phone number for the consignee on the parcel also revealed it to be a New Cingular Wireless number associated with PETERSEN.

9.      The shipment was scheduled to enter the United States through the JFK IMF, and a request for inspection was placed on the shipment by CBP. On about December 27, 2023, the shipment was detained and inspected at the JFK IMF, and subsequently referred to a CBP Agriculture Specialist for further inspection. On about January 8, 2024, the shipment was inspected, the contents identified as "wood fibers," and the shipment was released. On about January 11, 2024, the shipment was delivered to the SUBJECT LOCATION at 9:49 am, according to the United States Postal Service ("USPS") tracking website. The shipment was signed for by an "E Peterson."

10.     Following the release of this shipment, CBP personnel researched international imports destined to the SUBJECT LOCATION, and learned that since 2023, PETERSEN had received numerous additional shipments from "Alejandro Gomez

Fuentes" in Mexico. The following are the cargo descriptions used for those shipments: "Acacia SSP," "Botanica," "Acacia," "Tepescoguite," and "Mimosa Histillis Dye Naturals." Research into these cargo descriptions by CBP additionally revealed seizures of similarly described parcels that were found to contain Acacia root bark and Mimosa Hostilis root bark, which are the plant materials from which DMT is derived.

11.     Thereafter, in light of the foregoing, on about February 26, 2024, another hold for inspection was placed by CBP on two shipments inbound from Mexico to the SUBJECT LOCATION. Both shipments were destined to PETERSEN at the SUBJECT LOCATION, though with a spelling variation of the last name, being "PETERSON". On about March 14, 2024, CBP at the JFK IMF inspected the shipments, collectively totaling approximately 22 kilograms, manifested as "MIMOSA HOSTILLIS DYE NATURALS," and discovered that the contents consisted of wood bark. CBP sent the wood bark to a laboratory for further evaluation. On about May 21, 2024, the laboratory reported positive test results for the presence of DMT in the wood bark, at which point the parcels were seized as contraband.

12.     In about late June 2024, CBP reported to HSI that yet another parcel had been detected inbound to the U.S., destined for PETERSEN at the SUBJECT LOCATION and sent from the same Mexican shipper. On about July 7, 2024, the parcel was detained at the JFK for inspection. As of this writing, the parcel is still awaiting inspection. The parcel weighed out at approximately 19.5 kilograms, and was manifested as "PREMIUM BARRECUA SMOKING WOOD CHIPS."

**B. PETERSEN Manufactures and Distributes DMT from the SUBJET LOCATION**

13.     In about May 2024, CBP and HSI conducted open-source research on PETERSEN, from which we learned that the phone number associated with the December 12, 2023 shipment was also listed as the contact phone number for the website located at the URL "imakedmt[dot]com." This website promotes DMT awareness with a statement on the splash page stating, "We All Make DMT. I make DMT. You make DMT. Every living thing makes DMT. Learn how to extract DMT from plants and explore your consciousness." Additionally, this website advertises graphic t-shirts and merchandise for sale through "IMakeDMT.threadless.com."

14.     I have learned through additional research that PETERSEN appears to maintain social media accounts on YouTube and Facebook that are promoted through his DMT website. For example, a link at the bottom of PETERSEN's webpage takes the viewer to the YouTube channel titled "DMTV Dimethyltryptavision (@iMakeDMT)." This channel appears to have been created on January 20, 2007, and hosts 14 videos, amassing approximately 247,705 views and 6,210 subscribers. Titles of some videos posted to this channel include: "DMT Siphon Without Disturbing Crystals," "IMakeDMT EZ Base Extraction," "IMakeDMT Lab on the Run," and "How to siphon your collected DMT solvent without unwanted plant matter." In the video "IMakeDMT EZ Base Extraction," which was posted on July 6, 2023, and has approximately 202,000 views to date, step-by-step instructions are provided and demonstrated on how to manufacture DMT, starting with the raw plant material (bark) up though the final stage of forming/harvesting DMT crystals. In the process, as depicted in the video, large jars of brown liquid are generated as the brown ground root bark is saturated within a processing solution. The video and its description include the exact items needed, how

to acquire these items (with links to Amazon.com), and the recipe for extracting DMT

crystals. The following are excerpts from the instructions:

> Items you'll need:

> a.      Mimosa Hostilis or Acacia Root Bark (Finely Shredded or Powdered) Although I use 3 cups (240g) in this video you may use less or more OPTIONAL: 100g to 500g of bark without altering this tech;

> b.      Add 100g to 500g Mimosa Hostilis Root Bark;

> c.      Mix the bark into the base solution for 3-4 minutes using a drill mixer (OR) Close the Jar tight. Place a plastic baggie between the jar and the lid to create a better seal. Wrap the jar in a towel;

> d.      COLLECT THE RELEASED DMT WITH WARM NAPHTHA;

> e.      Use a cardboard box lined with clean paper on the bottom. Invert the glass tray so it's upside down and leaning against the inside of the box at about a 30-45-degree angle over the paper so it can drain and evaporate all of the Naphtha. Any DMT Crystals that fall out will be on the paper, but most should remain adhered to the glass tray. Wait for 10 hours to evaporate all the Naphtha. Then, use a razor to scrape the DMT from the glass tray;

> f.      The 3 pulls collectively harvest about 1% So if you use 300g of bark you likely yield around 3g of DMT. The Naphtha can be reused 5-6 times. When you're finished you can pour the dark base solution and plant matter down the drain. The naphtha can be fanned out over packed dirt or pavement for quick evaporation;

> g.      By learning how to extract DMT, you can provide this profound medicine for yourself. When you provide clear intentions of who you want to be, DMT will help you explore your own consciousness. By altering our brain's plasticity, we can let go of our past and adapt to our current reality, so we can make new neural connections and form new habits. DMT is our best chance to adapt to a future with less egos, and more empathy so that we can all live better. Help build awareness with a DMTee-Shirt because You and IMakeDMT.

> 15.      PETERSEN's YouTube site further references the distribution of wholesale

Mimosa Hostilis Root Bark, with the following statement found within the video

description for the video referenced above: "BARK inquiries, DM me to be invited to my

Private Hidden IMakeDMT Facebook group. Facebook.com/eric.petersen.108."

16.    The Facebook link listed in this video description redirects to the personal account of PETERSEN, which lists him as a "Shamanic Guide at I Make DMT" from March 2020 to present, based out of Saco, Maine. Additionally, within his posted photos, "IMakeDMT" logos matching the logo found on the website are abundant, as well as photos of a man who I believe to be PETERSEN based on my comparison of these photos to images associated with PETERSEN's Maine driver's license and U.S. passport.

17.    On about June 13, 2024, I received information from the USPS that PETERSEN had been observed in 2024 sending mail parcels and letters featuring a stamp next to his return address that bore the logo of "IMakeDMT;" this was indeed the same logo featured on his website and YouTube videos. An image depicting the logo is below:



18.     Additionally, on about July 8, 2024, I conducted a Google search of the
SUBJECT LOCATION (without the apartment number listed) and discovered that in
June 2024, the building itself (73 Water Street) had been listed on real estate websites
as being for sale. As part of the advertisement, numerous photos of the four furnished,
occupied apartments within the building are posted, and though the two apartments on
this first floor are not delineated in the photos, PETERSEN's apartment is clearly
discernable due to the presence of rugs, posters, and paraphernalia marked with
"IMakeDMT" and "I [heart] DMT" logos. The "IMakeDMT" logo appears to be identical
to the logo on PETERSEN's website, YouTube channel, Facebook site, and the logo
stamped on his outbound envelopes. The photos also appear to show a room containing
PETERSEN's laboratory, which features a large desk space with numerous jars filled
with dark brown and yellowish liquid on the desk and floor, as well as gas masks,
miscellaneous lab equipment, a drill mixer, and stacks of U.S. Postal Service priority
mailing boxes on the floor. The large jars containing dark brown liquid appear to be
identical to the jars shown in the video described in Paragraph 12 above, and are
believed to contain ground bark in the preliminary stages of DMT production. A photo
depicting this room taken from one such real estate website (Zillow.com) is provided
below:



19.     On about June 13, 2024, at approximately 11:15 a.m., HSI Portland Special Agent Ron Phillips conducted surveillance in the region of the SUBJECT LOCATION. A search in the Maine Bureau of Motor Vehicles revealed that PETERSEN did not appear to have a vehicle presently registered to him in Maine, and so no vehicle associated with PETERSEN could be observed in the parking lot of the SUBJECT LOCATION. As a result, Agent Phillips entered the building through a door off of the parking lot (closest to Water Street), which accessed a common hallway where the mailboxes were posted. SA Phillips observed a mailbox numbered "102," which was labelled "PETERSEN." In addition, SA Phillips observed two parcels on the floor addressed to ERIC PETERSEN at the SUBJECT LOCATION.

## TECHNICAL TERMS

20.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio,

video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

       d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

       e.      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include

various types of flash memory cards or miniature hard drives. This removable storage

media can store any digital data. Most PDAs run computer software, giving them many

of the same capabilities as personal computers. For example, PDA users can work with

word-processing documents, spreadsheets, and presentations. PDAs may also include

global positioning system ("GPS") technology for determining the location of the device.

        f.     Internet: The Internet is a global network of computers and other

electronic devices that communicate with each other. Due to the structure of the

Internet, connections between devices on the Internet often cross state and

international borders, even when the devices communicating with each other are in the

same state.

21.    Based on my training, experience, and research, I believe that electronic

devices have capabilities that allow them to serve as wireless telephones, digital

cameras, portable media players, GPS navigation devices, and PDAs. In my training and

experience, examining data stored on devices of this type can uncover, among other

things, evidence that reveals or suggests who possessed or used the devices.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

22.    As described above and in Attachment B, this application seeks permission

to search for records that might be found at the SUBJECT LOCATION, in whatever form

they are found.  One form in which the records might be found is data stored on a

computer's hard drive or other storage media (including cellular phones).  Thus, the

warrant applied for would authorize the seizure of electronic storage media or,

potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

23.    In my training and experience, individuals conduct a considerable amount

of communication using their cellular telephones. Those communications are in the

form of voice calls, text messages, SMS messages, MMS messages, e-mails, social media messages and posts, and messages shared via "chat" applications.

24.     I know that individuals who conspire with one another to conduct illegal activities often do so through the use of cell phones and other electronic devices, used to communicate through social media and/or contact one another by voice or text messaging. I believe that PETERSEN would have communicated through such methods regarding drug trafficking. I know that individuals often utilize their cellular phones and smartphones to access the Internet and that each time this is done the device maintains a record or "browser history," showing which websites were visited and when. I further know based on my investigation that PETERSEN uses the internet to market his DMT manufacturing and distribution services, so that his cellular phone and any computers or other storage devices located at the SUBJECT LOCATION are likely to contain evidence of those communications and activities.

25.     I know from my training and experience, as well as through consultation with a trained cellular phone forensic analyst, that evidence of the above forms of communication, and the browser history of such devices, are often kept in cell phones for months and even years. I know that a forensic examiner may be able to recover messages and other data that were manually deleted by the user of the phone. For these reasons, I believe that any cellular phones and smartphones utilized by a resident or residents of the SUBJECT LOCATION will contain communications revealing a substantial history of drug trafficking. For all those reasons, I request authorization to seize and search any cellular phones or smartphones found in the residence or on the person of PETERSEN at the time of the search.

26.     *Probable cause.*  I submit that if a computer or storage medium is found at the SUBJECT LOCATION, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

27.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

28.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT LOCATION because:

        a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

        b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from

16

further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described

herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

      c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

29.    *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and

software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

30.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

31.     Because more than one person may utilize the SUBJECT LOCATION, it is possible that the SUBJECT LOCATION will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

32.     I submit that this affidavit supports probable cause for a search warrant and there is probable cause to believe that evidence and instrumentalities of these

crimes, as described in Attachment B, are contained in the SUBJECT LOCATION

described and shown in Attachment A.

Respectfully submitted,

David C. Fife
Special Agent
Homeland Security Investigations

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date:   Jul 09 2024

City and state:   Portland, Maine

_Judge's signature_

Karen Frink Wolf,   U.S. Magistrate Judge
_Printed name and title_

21